473 A.2d 960

Arthur B. ELLIOTT et ux.

v.

Ronald KUPFERMAN, et al.

No. 935, Sept. Term, 1983.

Court of Special Appeals of Maryland.

April 12, 1984.

512

Bruce J. Gilbert, Bel Air, with whom was Lester V. Jones, Bel Air, on the brief, for appellants.

Marc Seldin Rosen, Baltimore, with whom were Read K. McCaffrey, Baltimore, and Maurice W. Baldwin, Jr., Bel Air, on the brief, for appellees.

Argued before WILNER, ALPERT and BLOOM, JJ.

WILNER, Judge.

Appellant Arthur B. Elliott was, for many years, a member of the Town of Aberdeen police force. He eventually became the chief of the town police. At some point, the Town Commissioners (appellees) decided to remove Elliott from the police force. At first, on August 24, 1981, they tried to dismiss him outright, but because the dismissal was not in conformance with the procedural requirements of the Law-Enforcement Officers' Bill of Rights (LEOBR, Md.Code Ann. art. 27, §§ 727–734D), the Circuit Court for Harford

County, upon Elliott's complaint, immediately required that he be reinstated. His termination on that occasion lasted but one day. On August 26, 1981, appellees placed Elliott on administrative leave (with pay) and filed charges against him under LEOBR. Before those charges were heard by an LEOBR hearing board, however, Elliott's two-year term as police chief expired, and he was not reappointed. That effectively terminated his status and employment.

Elliott and his wife sued appellees in the Circuit Court for Harford County. After some earlier pleading battles, the case ultimately was decided upon their second amended declaration which comprises seven counts, as follows:

Count I purports to allege an action under 42 U.S.C. § 1983. Elliott avers therein that by virtue of the procedural safeguards embodied in LEOBR he had a "property interest in his continued employment with the Aberdeen Police Department, said property interest being secured and guaranteed by the Constitution of the United States and the due process and equal protection requirements therein." He alleges that appellees, under color of State law, transgressed upon that property interest by:

(1) conducting an investigation, "the purpose of which was to gather information critical of [Elliott] in an attempt to initiate disciplinary action against [him] or to secure his demotion or dismissal from the Aberdeen Police Department";

(2) failing to meet "certain procedural safeguards," under LEOBR, specifically: (a) failing to inform Elliott of the name, rank, and command of the officer in charge of the investigation, as required by art. 27, § 728(b)(3); (b) failing to inform him in writing "of the nature of the investigation prior to his interrogation," as required by art. 27, § 728(b)(4); and (c) terminating him on August 24, 1981 without giving notice of his entitlement to a hearing, in violation of art. 27, § 730(a);

(3) thereafter filing charges against Elliott, including accusations of the commission of a criminal offense, "said

charges being motivated purely by political considerations"; and

(4) failing to provide a trial board before which Elliott could defend these charges.

All of this, he claimed, caused serious injury to his self-esteem, professional reputation, and marital tranquility. As recompense, he asked $500,000 compensatory and $2,000,000 punitive damages.

Count II is for abuse of process, although it does not indicate precisely the type of process that was allegedly abused. Elliott claims that appellees "caused to be issued process" against him "for the sole purpose of harassing, embarrassing, and humiliating [him] in hopes of forcing his resignation from his position as Chief of the Aberdeen Police Department," that their acts "were malicious and done without just cause, illegal, oppressive and done with a wanton disregard for [Elliott's] rights. . . . "

Count III asserts an action for defamation. Excess verbiage aside, Elliott alleges that appellees "did maliciously cause to be prepared and composed certain interdepartmental charges of misconduct," including one that involved a criminal offense, that "these defamatory matters were known to the Defendants to be untrue or should have been known to be untrue," and that they nevertheless with malice "knowingly, wantonly, and recklessly caused these defamatory allegations to be published and communicated to the community at large." He avers that he had previously enjoyed an excellent reputation for integrity, moral conduct, and proper activities as a police officer, and that the appellees' actions "were meant and intended to hold [Elliott] up to public scorn and ridicule and were made with actual malice and wilful intent to injure [him]."

Count IV, brought by Elliott and his wife, realleges by reference everything in Counts I through III. It asserts that appellees' failure "to prosecute allegations of misconduct on the part of [Elliott]" caused him emotional pain and suffering which affected his physical health and well-being,

and that, in turn, caused the plaintiffs to suffer a loss of consortium.

Counts V, VI, and VII also incorporate and reallege "all facts and matters" contained in the earlier counts. The theory of Count V is not entirely clear; we are told it was intended to charge malicious prosecution. Elliott claims therein that appellees "caused to be filed certain interdepartmental charges with the Aberdeen Police Department against [him]," that they "were solely responsible for the investigation and prosecution of said charges," that those charges "were initiated without jest [sic] cause, maliciously, and for private and improper motives," that "upon the filing of said interdepartmental charges... [Elliott] was notified to appear before an administrative trial board as provided in [LEOBR]," that the charges filed against him were then dropped and no hearing was held thereon, as appellees "knew them to be without merit and baseless...."

Count VI charges an invasion of privacy. Elliott avers that appellees caused to be published and circulated "certain allegations concerning the private and off duty activities" of Elliott that were of no legitimate concern to the public but were "of the type that would be highly offensive to a reasonable person" and were so to him. Finally, in Count VII, Elliott charges appellees with negligence in failing to "thoroughly investigate the truthfulness of the complaints against [him]" and in filing disciplinary proceedings "before determining whether there was in fact any basis therefore [sic]." Had appellees exercised reasonable care and thoroughly investigated the charges, he avers, "they would or should have known the complaints to be baseless and without merit."

Appellees responded to this pleading with a demurrer to all seven counts and with what we take as the renewal of a motion raising preliminary objection that had been filed in June, 1982, in response to the initial declaration. On May 27, 1983, the court disposed of the second amended declaration by granting the demurrer as to Count I and the motion

raising preliminary objection as to Counts II through VII. The court concluded that to the extent Count I sought to state an action under 42 U.S.C. § 1983, it was insufficient in that "no facts were shown to describe the nature and extent of [the] alleged property interest." The remaining six counts were dismissed on the basis of Md.Code Ann. art. 23A, § 1B(a), *i.e.,* governmental immunity. The court concluded that "[r]unning the police department is a discretionary function within the scope of [appellees'] employment," and that, aside from bald allegations, appellants had failed to "set forth any facts amounting to malice."

■ In this appeal appellants do not challenge the *procedural* correctness of those rulings, *i.e.,* whether the demurrer as to Count I was in proper form and whether the issue and underlying facts concerning appellees' immunity were properly before the court, and we shall therefore not address the procedural aspects of the court's rulings.[1] Rather, we shall

---

1. The demurrer to Count I was a classic example of a "speaking" demurrer—the averment of facts *dehors* the pleading to which it responded. The heart of it was this statement:
    "The Defendants aver that notwithstanding allegations of a property right in continued employment, then Chief Arthur B. Elliott served at the pleasure of the Town Commissioners and, contrary to the various implications in the pleadings, at the expiration of his contract, his contract simply was not renewed by the Town."
   It is not the function of a demurrer to controvert the factual allegations in a complaint or to present new ones. *Gallant v. Bd. of School Comm'rs,* 28 Md.App. 324, 345 A.2d 448 (1975); *Beach v. Mueller,* 32 Md.App. 219, 359 A.2d 232 (1976). The court's ruling, as noted, was premised upon its belief that Count I was legally insufficient in that "no facts were shown to describe the nature and extent of this alleged property interest." To what extent, if any, the court considered this extraneous averment in reaching that conclusion is unclear.
   The motion raising preliminary objection had been filed in June, 1982, in response to appellants' initial declaration. It had not been refiled in response to either the amended declaration or the second amended declaration. *See,* however, Md.Rule 320d8(b). The motion rested upon appellees' assertion that appellants had failed to show that appellees' actions were either ministerial or malicious, and in support of that contention appellees relied upon appellants' answers to interrogatories filed in response to the amended declaration. The court, in effect, concluded that by virtue of answers to interrogato-

confine ourselves to the substantive issues presented by appellants: does Count I state a cause of action under 42 U.S.C. § 1983, and are appellees immune from the liability asserted under Counts II through VII?

### (1) *Count I—§ 1983*

As we indicated earlier, from all of the information given to us in the various pleadings, answers to interrogatories, briefs, and argument, it appears that appellees proceeded against Elliott in three stages: (1) on August 24, 1981, they dismissed him outright, but as the result of a proceeding filed by him in court, he was reinstated the next day; (2) he was then immediately placed on administrative leave (with pay) and at some undefined point—alleged in an answer to an interrogatory to be more than six months later—charges were filed against him under LEOBR; and (3) at some later undefined time, his term of office expired and he was not reappointed.

Unfortunately, this sequence of events is not clearly set forth in Count I, or indeed in any of the counts, of the second amended declaration. Count I, in particular, says nothing at all about a term of office or about an appointment not being renewed. Insofar as Count I is concerned, Elliott was an untenured "at will" employee. For purposes of the demurrer, we are, of course, precluded from considering anything outside of the second amended declaration itself, except to the extent that statements made to us in argument may suffice as concessions.

Section 1983 provides, in relevant part, that:

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws,

---

ries rendered in connection with the *amended* declaration, appellees were immune from liability under the *second amended* declaration, pursuant to a motion filed in response to the *initial* declaration.

shall be liable to the party injured in an action at law. . . ."

It is a very broad statute, remedial in purpose. Its principal object is to provide a mechanism for enforcing the rights guaranteed by and under the Fourteenth Amendment, most notably the protection against deprivation of liberty or property without due process of law.

■ As the Supreme Court pointed out in *Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), a citizen's *liberty* interest and his *property* interest are not the same. In the context of dismissals from employment, one's *liberty* interest may be implicated where the employee has no cognizable right to the continued employment, but the dismissal serves to fetter some other Constitutional right that he does have. Thus, a dismissal may be found to violate a liberty interest when it is the result of unlawful discrimination, *Poolaw v. City of Anadarko,* 660 F.2d 459 (10th Cir.1981), or when it is in retribution for the exercise of First Amendment or other Constitutional rights, *Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972), *DiGrazia v. County Exec. for Mont. Co.,* 288 Md. 437, 418 A.2d 1191 (1980), *but see Trotman v. Board of Trustees of Lincoln University,* 635 F.2d 216 (3d Cir.1980), *cert. denied* 451 U.S. 986, 101 S.Ct. 2320, 68 L.Ed.2d 844 (1981), and *Wood v. Town of Frederica,* 529 F.Supp. 403 (D.Del.), *aff'd* 688 F.2d 828 (3d Cir.1982), or when it is accompanied by charges that might damage the employee's reputation in the community and he is given no opportunity to respond, *Board of Regents v. Roth, supra,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548, *Bishop v. Wood,* 426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976), *Duggan v. Town of Ocean City,* 516 F.Supp. 1081 (D.Md.1981), or where it imposes upon him some stigma or disability that forecloses other employment opportunities (such as barring him from other public employment), *Board of Regents v. Roth, supra, Kiekow v. Village of Chenequa,* 342 F.Supp. 494 (E.D.Wis.1972).

■ For a dismissal or termination to implicate a *property* interest, the employee must have some entitlement to the employment itself. But, as noted in *Roth,* 408 U.S. at 577, 92 S.Ct. at 2709, "[t]o have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it."

Elliott has made clear to us in argument, notwithstanding some ambiguity in his pleading, that Count I is based solely on an alleged deprivation of his *property* interest in continued employment as a police officer. He does not contend that appellees' actions have transgressed upon any *liberty* interest. We therefore shall confine ourselves to the question of whether, based on the allegations in Count I, appellees have deprived him of a property interest without due process of law.[2]

■ As a general rule, a non-tenured State or local government employee who serves "at will" is *not* regarded as having a property right in continued public employment. *Taylor v. Beckham,* 178 U.S. 548, 20 S.Ct. 890, 44 L.Ed. 1187 (1900); *Board of Regents v. Roth, supra,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548; *Bishop v. Wood, supra,* 426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684; *Hodgin v. Noland,* 435 F.2d 859 (4th Cir.1970), *cert. denied* 408 U.S. 942, 92 S.Ct. 2846, 33 L.Ed.2d 766 (1972); *Brown v. Hirst,* 443 F.2d 899 (4th Cir.1971), *cert. denied* 404 U.S. 1040, 92 S.Ct. 720, 30 L.Ed.2d 732 (1972). This includes a police officer. Absent some special tenure provision, a police officer does not have a federally protected right to continued employment as a police officer. *Boulware v. Battaglia,* 327 F.Supp. 368 (D.Del.1971); *Monroe v. St. Louis Metropolitan Police Dept.,*

---

2. Elliott has made no claim of abusive discharge under the principles laid down in *Adler v. American Standard Corp.,* 291 Md. 31, 432 A.2d 464 (1981), and we therefore do not address whether those principles are applicable to public employees or, if so, whether they would give any greater protection to a public employee than is afforded by § 1983.

524 F.Supp. 1009 (E.D.Mo.1981); *Fielder v. City of Richmond,* 468 F.Supp. 1119 (E.D.Va.1979); *DeBono v. Vizas,* 427 F.Supp. 905 (D.Col.1977).

▮▮▮ As both the *Roth* and *Bishop* Courts made clear, however, property interests are not created by the Constitution. "Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Roth,* 408 U.S. at 577, 92 S.Ct. at 2709. Thus, "[a] property interest in employment can, of course, be created by ordinance, or by an implied contract." *Bishop,* 426 U.S. at 344, 96 S.Ct. at 2077. In either case, the *Bishop* Court continued, "the sufficiency of the claim of entitlement must be decided by reference to state law." *Id.*

Count I does not allege any direct statutory or contractual entitlement to continued employment, as would be the case, for example, if Elliott had been employed for a specific term of years or could be discharged *only* for specific cause. *See, for example, Thompson v. Bass,* 616 F.2d 1259 (5th Cir.), *cert. denied* 449 U.S. 983, 101 S.Ct. 399, 66 L.Ed.2d 245 (1980); *Poolaw v. City of Anadarko, supra,* 660 F.2d 459, *but compare Bishop v. Wood, supra,* 426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684. Nor does LEOBR itself purport to afford such an entitlement; it neither creates a term of office for policemen nor specifies or limits the causes for which they may be dismissed. It does not, in short, provide tenure to police officers. *Allgood v. Somerville,* 43 Md.App. 187, 403 A.2d 837 (1979). Elliott's claimed entitlement, then, is an implicit one. LEOBR, he says, sets procedural conditions on the Town's ability to dismiss him; absent compliance with those conditions, there is no right to dismiss; *ergo,* absent compliance with those conditions, he has a protected property interest in continued employment.

LEOBR affords protection to police officers in two respects: (1) it seeks to protect certain "liberty" interests,

such as the right to engage in political activity (§ 728(a)), the right of privacy (§ 729), and the right to be free from retributive actions (§ 733), and (2) it sets forth certain procedural requirements in connection with investigations and other proceedings that may lead to disciplinary action. We are concerned here only with the latter. In that connection, the statute envisions and speaks to three phases of such proceedings: (1) the initial investigation that may lead to the filing of charges; (2) the filing of charges and the officer's right to a hearing thereon; and (3) the employer's right to accept, modify, or reject the findings and recommendations of the hearing board.

We summarized the procedural aspects of LEOBR in *Abbott v. Administrative Hearing Bd.,* 33 Md.App. 681, 682, 366 A.2d 756 (1976), as follows:

> "The purpose of these enactments was to guarantee that certain procedural safeguards be offered to police officers during any investigation and subsequent hearing which could lead to disciplinary action, demotion, or dismissal.... The law sets forth specific standards for the investigation of alleged misconduct, including the place and time of any interrogation of the officer, and requires that a written record be kept of the interrogation.... If the investigation results in the recommendation of some disciplinary action such as demotion, a full hearing must be held, affording the police officer the right to counsel, the right to present evidence, and the right to cross-examine witnesses.... The hearing is held before a 'hearing board,' chosen by the chief of police and comprised of other law-enforcement officers.... The written decision of the hearing board, accompanied by findings of fact, must be sent to the officer.... An appeal from the decision of the hearing board may be taken to the circuit court...."

We find nothing in either the plain language of these provisions or in any other relevant material that would suggest an intent on the part of the General Assembly to confer upon police officers any property right in their con-

tinued employment that they did not otherwise enjoy. Indeed, as we noted in *Abbott, supra,* 33 Md.App. at 688, 366 A.2d 756, to some extent, by supplanting local merit system laws to which a number of police officers formerly were subject, LEOBR may in fact have lessened their procedural rights.

The establishment of basic procedures for interrogations, investigations, and hearings is *not* the same as limiting the causes for which an officer may be dismissed. When an officer is told by the State that he may only be dismissed for certain specific reasons, he has a legitimate expectation that he will not be dismissed for any other reason. It is a simple application of the principle *inclusio unius est exclusio alterius,* and from that the "entitlement" spoken of in *Roth* arises. When the officer serves at will, however, and may be terminated for any reason not infringing upon some liberty interest, there is no such entitlement, notwithstanding that the process leading to his termination must comport with certain basic procedural requirements. *Compare Bell v. Gayle,* 384 F.Supp. 1022 (N.D.Tex.1974). Accordingly, we conclude as a matter of State law that the procedural requirements embodied in LEOBR do not suffice to give Elliott a property right in his continued employment as a police officer for the Town of Aberdeen.

Even if we were to assume, *arguendo,* that such a property right does exist, it is clear to us that the averments in Count I are wholly insufficient to show a deprivation of that right without due process of law.

Elliott makes essentially six complaints in Count I. First, he contends that appellees conducted an investigation to gather critical information in an attempt to initiate disciplinary action and secure his dismissal or demotion. Assuming that is true, we see nothing improper about it. As noted, § 728 envisions that such an investigation would and should precede the filing of charges. Next, he complains that appellees failed to tell him the name, rank, and command of the officer in charge of the investigation, as required by

§ 728(b)(3). Assuming that this is also true, we fail to see how such an omission could possibly rise to Constitutional dimension. There is no claim that appellees deliberately concealed the information, or even that there *was* "an officer" in charge of the investigation. At worst, Elliott has alleged a passive omission that could have been entirely inadvertent and corrected by a simple request on his part.

Third, he complains that he was not informed of the "nature of the investigation prior to his interrogation," as required by § 728(b)(4). Aside from the fact that the right to such information is found in § 728(b)(5), not (b)(4), here again, he has alleged no more than a passive omission, not a deliberate concealment. Indeed, it is not even clear from his pleading that he was ever actually interrogated. Elliott's fourth claim under Count I is that he was terminated on August 24, 1981, without being notified of his entitlement to a hearing as required by § 730(a) of art. 27. He does not allege here that he was in fact denied a hearing, that the failure to notify him of his right to a hearing was deliberate, or that he was unaware of his right to a hearing. Indeed, we know from his argument that he was well aware of his rights under LEOBR, that he immediately filed an action in court, and that he was promptly reinstated. Under these circumstances, the mere failure of appellees to give the notice required by § 730(a) would not constitute a denial of due process of law.

Penultimately, Elliott avers that charges were eventually filed against him, and that they were "motivated purely by political considerations." He does not tell us in Count I the precise nature of the charges;[3] nor does he allege that they were unfounded or that appellees knew they were unfounded. He apparently hopes that we will ascribe some *per se*

---

3. In his brief, Elliott tells us that they included allegations that he had "engaged in preferential treatment of officers under his command, violations of state law, questionable conduct with an unidentified female during his off duty hours, and the condonation of the use of or carrying of alcoholic beverages in police vehicles by members of the department."

pejorative connotation to the word "political" and infer that when elected town commissions act for "political considerations" they *ipso facto* act unconstitutionally. We decline to draw such an inference. *Compare Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976); *Branti v. Finkel,* 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980); *Moorhead v. Government of Virgin Islands,* 542 F.Supp. 213 (D.V.I.1982); *Aufiero v. Clarke,* 489 F.Supp. 650 (D.Mass. 1980), *aff'd* 639 F.2d 49 (1st Cir.), *cert. denied* 452 U.S. 917, 101 S.Ct. 3052, 69 L.Ed.2d 421 (1981), where the discharge or termination of certain types of employees by reason of their political affiliation was regarded as impinging upon First Amendment rights.

Finally, Elliott charges that, having brought these charges, appellees "failed to provide a trial board before which [he] could defend these charges." Again, he gives no substance to the complaint: over what period of time did they fail to constitute a trial board, was it a passive omission or one designed to circumvent his right to a hearing on the charges, did he request a trial board? The bald allegation that appellees failed to provide a trial board simply does not suffice.

This is the sum and substance of Count I. It does not suffice to show the deprivation of a property interest without due process of law, and therefore does not suffice to state a claim under § 1983.

### (2) *Counts II—VII*

As we noted, unlike Count I, Counts II through VII were not disposed of in response to the demurrer, but pursuant to the motion raising preliminary objection. The issue before us, then, is not the general sufficiency of the allegations in those counts, but whether the court erred in finding that appellees enjoyed the protection of governmental immunity.

To the extent that Counts II through VII allege causes of action, they are clearly in tort. Art. 23A, § 1B(a) provides: "Officials of a municipal corporation, while acting in a discretionary capacity, without malice, and within the scope

of their employment or authority shall be immune as officials or individuals from any civil liability for the performance of such actions."

To fall within the protective ambit of this statute, four elements must be shown: (1) the defendants are officials of a municipal corporation; (2) they acted in a discretionary capacity; (3) they acted within the scope of their authority; and (4) their actions were not malicious. *See James v. Prince George's County,* 288 Md. 315, 418 A.2d 1173 (1980), applying essentially the same four factors as a matter of common law. Elliott concedes (1) and (3). Although he acknowledges that ordinarily the dismissal of a police chief is a discretionary act, he argues that appellees were under a ministerial duty to comply with LEOBR and that element (2) is therefore lacking. We find no merit to that argument. The acts complained of in Counts II through VII relate to the filing of charges by appellees, the motivation for their being filed, the nature of the charges, and the manner in which the charges were filed and prosecuted. Although Count I mentions a number of alleged derelictions in terms of LEOBR, the clear thrust of Counts II through VII is directed at the decision to terminate Elliott and the manner in which that decision was implemented. That, clearly, is a discretionary function.

The real issue with respect to these six counts is whether Elliott made a sufficient showing of malice on the part of appellee.

Malice, in this context, consists of the intentional doing of a wrongful act without legal justification or excuse. An act is malicious if it is done knowingly and deliberately, for an improper motive and without legal justification. *Prince George's Co. v. Blumberg,* 44 Md.App. 79, 106–07, 407 A.2d 1151 (1979), *aff'd and rev'd in part,* 288 Md. 275, 418 A.2d 1155 (1980), *cert. denied* 449 U.S. 1083, 101 S.Ct. 869, 66 L.Ed.2d 808 (1981); *Davis v. Muse,* 51 Md.App. 93, 99–100,

441 A.2d 1089 (1982). That is the standard. We look now to see if it was sufficiently alleged.

Count II alleges that appellees caused process to issue for the sole purpose of harassing Elliott in order to force his resignation, that such acts "were malicious and done without just cause," and that they were "illegal, oppressive and done with a wanton disregard" for his rights. In Count III, Elliott avers that the charges filed against him "were known to the Defendants to be untrue or should have been known to be untrue" and that appellees "knowingly, wantonly, and recklessly caused these defamatory allegations to be published and communicated to the community at large." Count IV merely seeks damages for loss of consortium; it alleges no additional tortious conduct. Count V alleges that the charges brought by appellees "were initiated without jest [*sic*] cause, maliciously, and for private and improper motives." Count VI has fewer adverbs; it charges that appellees caused to be published "certain allegations concerning the private and off duty activities" of Elliott that were of no legitimate concern to the public. Count VII charges simple negligence.

From the pleading alone, it is clear that no liability would arise under Counts VI and VII. No attempt even has been made to allege malice under those counts. In Counts II, III, and V, Elliott has at least made conclusory allegations of malice. But, as was said in *Greenbelt v. Pr. George's Co.,* 248 Md. 350, 360, 237 A.2d 18 (1968):

"Characterizations of acts or conduct, no matter how often or how strongly adjectively asserted, are, without supporting statements of fact (not evidence), conclusions of law or expressions of opinion. . . . Allegations of fraud or characterizations of acts, conduct or transactions as fraudulent, arbitrary, capricious or as constituting a breach of duty, without alleging facts which make them such, are conclusions of law insufficient to state a cause of action."

■ The same is true with respect to malice. Merely asserting that an act was done maliciously, or without just cause, or illegally, or with wanton disregard, or recklessly, or for improper motive does not suffice. To overcome a motion raising governmental immunity, the plaintiff must allege with some clarity and precision those facts which make the act malicious. *See Carder v. Steiner,* 225 Md. 271, 170 A.2d 220 (1961), *overruled on other grounds, James v. Prince George's County, supra,* 288 Md. at 323, n. 9, 418 A.2d 1173.

■ Elliott was given an opportunity in connection with his amended complaint to explain how the various acts charged to appellees were malicious. Interrogatory No. 8, filed November 12, 1982, asked him to state the factual basis for his contention that any act committed by appellees was malicious or was performed with wanton disregard for his rights; his answer, filed February 10, 1983, was a mere recasting of conclusory allegations, adding nothing of substance.[4] Upon this state of the record, we do not believe that the court erred in concluding that appellees were protected by governmental immunity.

JUDGMENT AFFIRMED; APPELLANTS TO PAY THE COSTS.

---

4. Answer No. 8 was as follows:
"The action of all Defendants, on Monday, August 24, 1981, in attempting to remove the Plaintiff from his position as Chief of the Aberdeen Police Department without just cause or reason and without complying with the legislative mandates of the Law Enforcement Officer's Bill of Rights was malicious and done with a wanton disregard for the rights of Plaintiff. Additionally, the Defendants attempted to discharge the Plaintiff for mismanagement of the Aberdeen Police Department, although they had no justification for the allegation. Further, although the Plaintiff was placed on administrative leave in August of 1981, no interdepartmental charges were placed against him for a period in excess of six (6) months. Plaintiff is unable to determine which of the individual Defendants may or may not have taken part in these activities, but avers and believes that these actions were taken by the individual Defendants acting in concert with one another and on behalf of the municipal corporation."